```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA


HELEN HARDINGER, Executrix    )
of the Estate of RONALD C.    )
HARDINGER,                    )    Civil Action No. 04-382
                              )
           Plaintiff,         )    Judge McVerry
                              )    Magistrate Judge Caiazza
      v.                      )
                              )
EQUITABLE RESOURCES, INC.,    )
and EQUITRANS, L.P.,          )
                              )
           Defendants.        )
```

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Defendants' Motion for Summary Judgment (Doc. 21) be denied.

### II.   REPORT

**BACKGROUND**

    **A.   General Background**

Ronald C. Hardinger[1] filed this lawsuit against his former employer, Equitrans,[2] alleging age discrimination.  *See generally* Am. Compl. (stating claims of age discrimination under ADEA and

---

[1]  Mr. Hardinger died several months after filing this action, and Executrix Helen Hardinger has been substituted as the Plaintiff.  *See generally* Doc. 16. Nevertheless, the undersigned at times hereafter will refer to Mr. Hardinger as the Plaintiff.

[2]  The Plaintiff has sued two Defendants, Equitable Resources, Inc. and Equitrans, L.P., under the joint-employer theory.  *See* Am. Compl. (Doc. 11) at 2, ¶ 4.  Although technically Mr. Hardinger worked for Equitrans when his employment was terminated, *see* Defs.' Facts (Doc. 23) at ¶ 7, the Defendants have identified no meaningful distinction of identity for the purposes of this lawsuit.  Accordingly, the court will refer to the companies collectively as "Equitrans" or "the Defendants."

PHRA). Mr. Hardinger provided the Defendants thirty-seven years of service before he was terminated on June 30, 2003. *See* Pl.'s Facts (Doc. 26) at 6, ¶ 1. And though the Defendants' summary judgment request presents a close case, the Plaintiff has presented just enough evidence to withstand the same.

**B.   Facts**

In December 1998, Mr. Hardinger began acting as Equitrans' Director of Gas Control. *See* Defs.' Facts at ¶ 7. According to the Complaint, the Defendants in 2000 instituted a reduction in force ("RIF") program aimed at, or having the effect of, eliminating older workers. *See generally* Am. Compl. at ¶¶ 8-10; *see also generally id.* at ¶ 11 (discussing new performance evaluation system requiring at least 10% of workforce to receive negative reviews). The Plaintiff apparently survived the initial RIF, however, having retained the Director of Gas Control position through June 2003. *See generally* discussion *supra*.

Mr. Hardinger nevertheless became concerned when in June 2001 Equitrans began advertising a job position titled "Director of Gas <u>Systems</u> Control." *See* Pl.'s Opp'n Br. (Doc. 25) at 1; *see also* Pl.'s Appendix (Doc. 26-2) at 7 (job advertisement) (emphasis added). Although the posting listed some of the same job responsibilities handled by the Plaintiff, it also contemplated the "overs[ight] and direct[ion] of the entire Gas Control group," which included gas control

-2-

(run by Mr. Hardinger), gas management and gas measurement (run by two other employees).  *See* job advertisement; *compare also* Defs.' Facts at ¶¶ 18-19 *with* Pl.'s Responses to same (failing to deny existence of three groups).  The Plaintiff does not deny that the job posting sought applicants with educational degrees not possessed by Mr. Hardinger.  *See generally id.*

One of Equitrans' vice presidents, Fred Dalena, was responsible for deciding to create the new position.  *See* Defs.' Facts at ¶ 9.  He and other Equitrans agents hired Chris Akers, a substantially younger individual who possessed an engineering and a master's degree.  *See id.* at ¶ 28.

Mr. Dalena also created a position entitled Manager of Systems Optimization, which was filled by younger individual Jim Novacek in April 2001.  *See* Defs.' Br. at 3 (citing record evidence).  Among other things, this individual was hired "to develop an analytical computer model of [Equitrans' gas] transmission, compression and storage system."  *See id.* Mr. Hardinger does not claim to have possessed the background or expertise to undertake these functions.

Finally, Mr. Dalena created the position of Storage Optimization Director, and Timothy Habovick was hired to fill it. *See generally* Defs.' Br. at 3-4.  Again, Mr. Habovick was a younger individual possessing educational and experiential qualifications not shared by Mr. Hardinger.  *See generally* Defs.'

Facts at ¶¶ 100-105.  The Plaintiff offers no serious contention that he was qualified for this position.

As these additional employees settled into place, Equitrans implemented "a new Supervisory Control and Data Acquisition ('SCADA') system."  *See* Defs.' Br. at 4.  A SCADA system "electronically monitors the gas flow system, allowing operators to monitor a computer screen for changes."  *See id.*  A previous SCADA system existed, and Mr. Hardinger was familiar with and utilized it.  *See generally id.* at 8 (Plaintiff "served as the point of contact for gas control information when the old SCADA system [was] in place").

The Defendants assert that the aforementioned hirings and technological advances eliminated the need for Mr. Hardinger's position.  For example, the new SCADA system "gave people across the company access to the gas control data," thereby "eliminating dependence on the Director of Gas Control[, *i.e.*, the Plaintiff] for that information."  *See* Defs.' Br. at 4.  Also, the utilization of Mr. Novacek's computer model significantly decreased the need for Mr. Hardinger to manually monitor the gas flow system.  *See id.* at 8; *see also id.* at 9 ("it was no longer necessary . . . to manually monitor the gas flow system on a daily basis because the [computer] model eliminated that need") (emphasis in original omitted).  Last was Equitrans' decision to relocate its Gas Control Operators from the company's site

at Tepe Station to its operations in the Allegheny Center Mall. *See id.* at 4. Said workers, who previously were supervised by the Plaintiff at Tepe Station, fell under the management of Mr. Akers once they were transferred to the Mall. *See generally id.* In light of these events, the Defendants contend, the Director of Gas Control position no longer was necessary and Mr. Hardinger's employment was terminated.

## ANALYSIS

### A. The Plaintiff's *Prima Facie* Case: Summary Judgment is Inappropriate Under the Mini-RIF Theory

Defense counsel argues that Mr. Hardinger's *prima facie* case should be examined under a typical RIF analysis. *See* Defs.' Br. at 6. Those standards would require the Plaintiff to identify "similarly situated, sufficiently younger employee[s who were] retained." *See id.* (citing published Third Circuit authority). The Defendants argue that none of the individuals identified above, Messrs. Akers, Novacek, and/or Habovick, were similarly situated to Mr. Hardinger.

If this were the appropriate inquiry, the undersigned probably would agree that the Plaintiff cannot show similar situation. All of the referenced individuals had different work experience, educational backgrounds, and job functions than Mr. Hardinger, and he has failed to demonstrate his qualification for any of their positions.

Relatedly, the Plaintiff's allegations do not present a failure to promote claim within the context of Mr. Akers, nor does counsel suggest Mr. Hardinger was improperly excluded from consideration regarding the positions filled by Messrs. Novacek or Habovick.

Rather, the Plaintiff's opposition to summary judgment relies on the "mini-RIF" theory. *See* Pl.'s Opp'n Br. at 14-15 (arguing case presents mini-RIF because Mr. Hardinger "was the only employee laid off on or about June 30, 200[3]"). Although Equitrans, now and at the time of the firing, labeled Mr. Hardinger's termination a reduction-in-force, it remains the Plaintiff's prerogative to determine the legal theory upon which to proceed. *See generally* Kennedy v. U.S., 643 F. Supp. 1072, 1079 (E.D.N.Y. 1986) ("it is plaintiffs' prerogative to determine the theories of their actions"); *see also generally* discussion *supra* (noting Mr. Hardinger withstood RIF that utilized new performance evaluation system mandating 10% employee failure rate).[3]

---

[3] Notably, the Defendants do not complain that the pleadings fail to explicitly reference the mini-RIF theory. There is no prejudice to Equitrans, moreover, as its summary judgment papers address the key element in a mini-RIF case, namely the plaintiff's allegation that his job responsibilities were transferred to younger employees. *See* Defs.' Reply Br. (Doc. 27) at 8-9; *see also* Am. Compl. at ¶ 17 ("[m]ost of [the] Plaintiff's duties were transferred to . . . younger employees").

Under the mini-RIF theory,

> a single employee is discharged and his position is not filled.  However, the employee's responsibilities are assumed by other members of the corporate workforce. . . .  Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations . . . [of] individual[s] with . . . unique job[s], [courts] have dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably.
>
> Instead, because the fired employee's duties are absorbed by other workers . . ., [courts] only require that a plaintiff demonstrate . . . his duties were [subsumed into the jobs of retained] employees who were not members of the protected class.

*See* Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 693 (7th Cir. 2000) (citations omitted).[4]

---

[4]  The undersigned's research has failed to identify Third Circuit authority discussing the mini-RIF theory.  As suggested in Michas, however, the Plaintiff's approach is not that far afield of the norm:

> Ultimately, calling an adverse employment action a 'mini-RIF' merely emphasizes that *McDonnell Douglas*, rather than the RIF test, should apply.  [For i]n both the traditional *McDonnell Douglas* analysis and the mini-RIF analysis, the discharged employee's duties [often] are assumed by other employees . . . .

*See id.* at 693.  Allowing the Plaintiff to proceed under this theory also is consistent with the Third Circuit Court's recognition that the *prima facie* standards are neither rigid nor onerous.  *Compare* Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875-76 (7th Cir. 2002) (mini-RIF theory's "assumption of work duties" requirement is part of *prima facie* case, and said theory was developed because "the requirements for making a *prima facie* case" must be flexible and "reflect the reality of the workplace") *with* Sarullo v. U.S.P.S., 352 F.3d 789, 797-98 (3d Cir. 2003) (in context of employment discrimination, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied") (citation omitted), *cert. denied*, 541 U.S. 1064 (2004).

Here, the Defendants must concede that certain of Mr. Hardinger's job responsibilities were transferred to younger employees. *See, e.g.,* Defs.' Reply Br. at 9 ("[s]ome aspects of [Mr.] Hardinger's duties were assumed by younger employees"). In addition, Plaintiff's counsel has been able to generate at least some doubt regarding the Defendants' assertion that the significant duties of Mr. Hardinger's position were not so transferred. *See, e.g.*, Pl.'s Opp'n Br. at 17 (highlighting material similarities between job descriptions of Messrs. Akers and Hardinger); *id.* at 15 (noting Mr. Akers assumed responsibility for six Gas Control Operators previously supervised by Plaintiff); *and id.* (highlighting that Mr. Hardinger previously was responsible for monitoring gas flow system, both manually and through SCADA system).  In light of the favorable inferences afforded the Plaintiff under the summary judgment standards, the undersigned cannot say that Mr. Hardinger has failed his *prima facie* burdens as a matter of law.

    **B.    The Plaintiff's *Price Waterhouse* Evidence Is Sufficient to Survive Summary Judgment**

Were the Plaintiff restricted to the pretext theory under *McDonnell Douglas*, he would have a difficult time getting this case to a jury.  As Defense counsel explains, it strains credibility to believe that Equitrans undertook its elaborate hiring and technological advances merely to justify the

termination of a single fifty-seven year old employee.  *See generally* Defs.' Br. at 1 (summarizing company's creation of three new positions, development of computer model, replacement of SCADA system, and relocation of operations).  Plaintiff counsel's suggestions notwithstanding,[5] these circumstances simply do not present a very convincing case of pretext.

The Plaintiff has been able, however, to cobble together sufficient *Price Waterhouse*-type evidence to make the entry of summary judgment difficult to endorse:

- The architect of Equitrans' administrative and technological advances, Fred Dalena, told the Plaintiff repeatedly the company was looking for "new blood," a phrase understood by some courts as code-speak for age bias;[6]

- in response to another employee's inquiry regarding whether older people were being let go, Mr. Dalena stated "[t]hat appears to be the case";[7]

---

[5] *Cf., e.g.*, Pl.'s Opp'n Br. at 16 (characterizing above events as "sophisticated move[s] by an employer intent on discriminating [against Mr. Hardinger] and getting away with it").

[6] *See* Pl.'s Facts at 8, ¶ 28.  There is a split of authority regarding the significance of the "new blood" phrase.  Some Pennsylvania federal courts, however, have found the language to be relevant.  *See, e.g.*, Kasali v. J.P. Morgan/Chase Manhattan Mort. Corp., 2005 WL 2989299, *5 (E.D. Pa. Nov. 7, 2005); Murtha v. Forest Elec. Corp., 1992 WL 174606, *7 (E.D. Pa. Jul. 14, 1992).  And while the Defendants have argued, convincingly, that Mr. Dalena's alleged comments were both temporally remote and unrelated to the decision-making process, they are at least some evidence of potential bias in the upper echelon of the corporate hierarchy.

[7] *See* Pl.'s Facts at 9, ¶ 29.  Defense counsel highlights the ambiguity of this statement.  It may be that Mr. Dalena was talking only of appearances, but the statement also can be read as expressing agreement with the matter asserted.  In resisting summary judgment, the Plaintiff enjoys the benefit of the doubt.

- Mr. Akers, who made the decision to terminate the Plaintiff, engaged in a colloquy that may be interpreted as age-biased:

    [H]e made several references to my being close to retirement.  One was that, 'You ought to be sitting pretty good with a lot of stock in the company. . . .  You ought to be looking to probably cash in your chips and get out of here.['] . . . [H]e says, 'Yeah, how old are you now?'  And I said . . . 57 at the time.  And he says, 'Yeah, you're old enough. . . .  You ought to be getting out of here. . . .  [T]hey are looking for guys like you . . . to make . . . a deal.';[8] and

- Human Resources Vice President Stephen Davis asked the Plaintiff to retire and/or stay on as a consultant for six months to alleviate concerns regarding the company's image, given that "so many older, senior employees had been let go."  See Pl.'s Facts at 9, ¶ 31.

The undersigned submits that, while any one of these statements would be insufficient on its own, the totality would permit a jury to conclude ageist attitudes had an influence on the employment decision.  See generally Abramson v. William Paterson College of N.J., 260 F.3d 265, 285 (3d Cir. 2001) ("[i]n determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands

---

[8] See Pl.'s Dep. Tr. (attached under Doc. 26-3) at 51.  The Defendants compare this evidence with the record in Glanzman v. Metropolitan Management Corp., where the plaintiff's immediate supervisor "asked about [her] retirement plans."  See id., 391 F.3d 506, 513 (3d Cir. 2004).  The Glanzman Court agreed that the supervisor's comment "just as easily [could] be explained by a desire on [the employer's] part to do some long-term planning."  See id.  While a fact finder could reach the same conclusion here, the details above reasonably may support an alternate inference.

of evidence"; fact finder "would be entitled to view the evidence as a whole") (citation and internal quotations omitted).

The undersigned also believes that the Plaintiff's evidence survives summary judgment (albeit barely) under the second prong of the *Price Waterhouse* inquiry. *See* Glanzman, 391 F.3d at 512 (once sufficient direct evidence is presented, "the employer [attempts to] prove that it would have fired the plaintiff even if it had not considered . . . age") (citations and internal quotations omitted). While the discussions above regarding the lack of credible pretext evidence would apply with equal force here, the court cannot quite say that no reasonable juror could find in the Plaintiff's favor. *Cf. generally* Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (on summary judgment, reviewing court "may not make credibility determinations or weigh the evidence") (citation and internal quotations omitted).

## **CONCLUSION**

For the reasons stated above, the Defendants' Motion for Summary Judgment should be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this report and recommendation are due by February 16, 2006.  Responses to objections are due by February 27, 2006.


January 31, 2006

Francis X. Caiazza
U.S. Magistrate Judge

cc:

Michael J. Lorence, Esq.
1007 Mount Royal Boulevard
Suite 200
Pittsburgh, PA  15223

Martha Hartle Munsch, Esq.
Joseph P. McHugh, Esq.
Reed Smith
435 Sixth Avenue
Pittsburgh, PA  15219-1886